## NEW-YORK SUPERIOR COURT.

DANIEL L. PETTEE, assignee, &c., appellant, agt. JOHN ORSER, Sheriff of the city and county of New-York, respondent.

On no ground can an *assignment* of all the property of the firm, for the benefit of creditors, creating a trust and *giving preferences*, be sustained, when made by a *portion* of the members of a *partnership*, without the concurrence and consent of the other acting partners.

*New-York General Term, February*, 1860.

*Present*, BOSWORTH, *Ch. J.*, HOFFMAN *and* MONCRIEF, *Justices.*

THE action was brought by the present plaintiff, as assignee of the firm of W. & A. Crumbie & Randall, against the defendant as sheriff, to recover from him certain personal property which it was alleged he wrongfully detained.

The case was tried before Mr. Justice SLOSSON and a jury, and the learned judge directed the complaint to be dismissed. Judgment was entered to that effect on the 9th day of June, 1859. A motion for a new trial had been made and denied on the 19th day of May, 1859. From the judgment and the order denying a new trial, the present appeal was taken.

The defendant justified his taking the property demanded, by virtue of an execution issued upon a judgment recovered by Bunce and others, against the firm of W. & A. Crumbie & Randall, on the 7th day of May, 1855, for $603.39. The execution was put in his hands on the 23d day of May ; and,

during the lifetime of the same, he levied upon the property in question.

The goods had been delivered to the plaintiff under the provisions of the Code. The defendant demanded, in his answer, the return of the same, or the full value of the goods to be assessed, with damages.

The jury at the trial assessed the value at the sum of $797.70.

The judgment entered was in favor of the defendant against the plaintiff for the return of the property described in the complaint, or, in case a return thereof could not be had, for the recovery of the value as assessed by the jury, viz., $797.70, and also that the defendant recover of the plaintiff his costs, including interest on the verdict.

The assignment under which the plaintiff claimed was dated the 31st day of January, 1855. It purported to be made between William Crumbie, Alexander Crumbie, James McLean and Henry Randall, doing business under the firm and name of W. & A. Crumbie & Randall, of the city of New-York, of the first part, and Daniel L. Pettee, of the second part: it recited the indebtedness of the firm to several creditors, and its inability to pay them in full; and transferred some property specifically mentioned, and also all and singular, every and any other property of whatsoever description, and wheresoever situated, belonging to the said parties of the first part. The trusts and purposes were as follows:

To have and to hold the said estate, and all and singular the premises hereby bargained and assigned, unto the said party of the second part, and his legal representatives, to his own proper use and benefit forever. In trust, nevertheless, and this indenture of assignment is hereby declared to be made upon the trust and confidence, and for the uses, intents and purposes herein specified, that is to say,

*First.* To sell the estate, and all and singular the property hereby bargained and assigned, at public auction or at private sale for cash, and for the best prices that can be obtained therefor, as soon hereafter as practicable; and to demand, sue for, and collect all debts and demands of every nature whatever,

that now are or may become due to the said parties of the first part.

*Second.* Out of the proceeds coming into the hands of the said party of the second part, to pay and satisfy all reasonable fees, costs, charges and expenses which the said parties of the first part now owe, or have been put to, by reason of legal advice tending to and comprehending the making and execution of this indenture, and other papers necessary and proper to carry the objects of this indenture into effect, including the costs and expenses allowed by law.

*Third.* To pay any costs, charges and expenses (out of the proceeds) to which the said party of the second part may be put or rendered liable in originating, prosecuting and defending suits otherwise in aid and furtherance of the object, intention and execution of this indenture.

*Fourth.* To pay (out of the said proceeds) the several creditors mentioned in schedule A., hereunto annexed, the amount of their respective debts in full; or, should the proceeds be insufficient for that purpose, to appropriate them to the last mentioned creditors in proportion to their debts respectively.

*Fifth.* After satisfying the aforementioned trusts, to pay, out of the said proceeds, all the rest and remainder of the creditors of the said parties of the first part, their respective debts in full; or, should the proceeds be insufficient for that purpose, to appropriate the residue and remainder of the said proceeds to the last mentioned creditors in proportion to their debts respectively.

There was also the usual clause constituting the party of the second part the lawful attorney of the parties of the first part.

The instrument was signed with the partnership name and seal, and by William Crumbie and Henry Randall, with their respective seals.

The schedule of preferred creditors shows a liability of $1291.50, and to numerous other persons in small sums, being, in the aggregate, about $330,000.

It was proven, on the trial, that Alexander Crumbie was absent from the state of New-York, and on his way to California

on business of the firm, and that McLean, who resided in Brooklyn, was also absent, and in the island of Cuba on business of the firm, at the time the assignment was made.

It was also proven that such assignment was never executed or ratified by Alexander Crumbie and James McLean, or either of them, and was dissented from by them as soon as they received notice, or had any knowledge, that said assignment had been made.

W. C. NOYES, *for appellant.*
A. J. VANDERPOEL, *for respondent.*

By the court—HOFFMAN, Justice.    The learned counsel of the plaintiff has adopted for his premises, as an incontestable proposition, that the power of disposition, as well as the power of acquiring and of binding, is fundamentally inherent in each partner by the very constitution of a partnership.    All these attributes of power follow the relation.    His argument on this basis is forcible and logical.    Every thing of restriction and modification of this absolute authority must be rigorously established, either from positive convention, or express judicial authority precisely to the point.    The assumption is of entire authority.    The exception must be exactly and strictly limited to what has been expressly declared to be an exception.

But the premises of the learned counsel are far from possessing that entire legal verity which his deduction assumes. Looking only to the ordinary and superficial statement of the relation of partners found in the elementary treatises, his position may appear plausible, if not certain.    But looking to the origin of the law of this relation, and the source from which England, and we after England, have obtained it, its accuracy may be questioned.

The law of England as to partners is derived from the *Lex Mercatoria*, and from the civil law.    The abridgements of *Brooks* and *Fitzherbert* have no such title.    Even in *Viner's Abridgment*, there are no cases cited prior to the reign of Charles the Second.

Lord COKE says that the *Lex Mercatoria* or the Law Merchant is part of the law of England (*Coke Litt.* 11 *b.*), and Sir WILLIAM GRANT, in *Devaynes* agt. *Noble*, (1 *Merivale*, 563), observes that the common law, although it professes to adopt the *Lex Mercatoria*, has not adopted it throughout, in what relates to partnership in trade.

In *Molloy's Treatise De Jure Maritimo, p.* 488, (*Book* 3, *chap.* VII, 14), it is stated, "If two joint merchants occupy their stock, goods and merchandise in common, one of them, naming himself a merchant, shall have an account against the other, naming him a merchant, and shall charge him as *receptor denariorum ipsius B. ex quacunque causa et contractu ad communem utilitatem ipsorum A & B. provenient—Sicut per legem mercatoriam rationabiliter monstrare poterit.* He cites 10 *Hy.* 71, 16 *a Fitzherbert Natura Brev.* 117, *D.*

It cannot be questioned that the law of England upon this subject has been drawn primarily from the civil code. As trade and commerce arose, partnerships, and societies, and corporations grew up, and the resort of the untrained lawyers of the age must have been to those sources which the civil law in its plentitude of legislation opened to them. Yet I know of no author, except *Mr. Watson*, who has noticed this fact. (*On Partnership Introduction*, XXV.)

Two questions, then, occur: *First*, does the relation of co-partners imply the existence of a power in each partner, in contemplation of a dissolution, to transfer the whole property to the custody and control of a stranger? *Second*, did the civil law, from which England derived the system, recognize such an absolute power of disposition?

It cannot be said that there is an inherent necessity for the existence of such a power, in order to accomplish the purposes of a partnership. It would be strange to say that what is done in view of a destruction, or effects a destruction of the relation, springs from such relation, or the powers it logically or reasonably implies. The power is justly implied to do everything which tends to aid, to strengthen, and protect. Many of the leading objects of a partnership—the augmentation of capi-

tal, the combination of the varied skill of different persons, the increase of the power of labor, and the expansion of effort and enterprise—can be attained (perhaps less efficiently) without the transmission of the whole authority of the firm to each member, for either the acquisition or disposition of property. In short, whatever tends to preserve, may well be deemed inherent and essential; what pre-supposes, or produces dissolution, is not merely not inherent, but really repugnant to the abstract idea of a single partner's power. The union of will created the relation; the union of will seems necessary to destroy it.

And if we find this view sustained by the civil law, we may venture to be assured of its justness, and be emboldened to found our reasoning upon it.

The civil law did not deem such an authority essential to the nature of a partnership. I may go further, and say that the power of absolute disposition of capital stock resided only in the body of the firm—the *corpus societatis.*

Thus *Gaines (Libro* 10, *ad edictum Provinciale Digest: Corpus juris Civilis, Lib. XVII; Tit.* 11, 68,) says—*Nemo ex sociis plus parte sua potest alienare etsi totorum bonorum socii siut.* The text of *Domat,* as translated by Dr. Strahan, is as follows: "Partners, even those who are in partnership of their whole estate and goods, can alienate only their own share of the common stock, and cannot, by their deed, bind the community, except in so far as it has empowered them."

So *Voet (Comm: Tome* 2, *p.* 205, *Pro Socio*), says: "Finally, (and to this the *action pro socio* is suitable), the partner should allow the other partner to use the common property for those purposes for which it was originally furnished by the will of the partners; and conversely, should abstain from all dealings with the common stock, which are new, and repugnant to the primary destination of the partners."

The President *Favre,* in his treatise upon the *Pandects (quoted by Troplong De Societe, Tome* 12, *p.* 83), says: "*Sic enim intellige ut qui societatem, etiam universalem et in perpetuam, contrahit, rem suam communicet socio et in eam partem*

*dominii transferat non in perpetuam, sed quamdin tantum durat societas.*"

The learned author *Troplong*, whom I have quoted, in his commentary upon the 1860th article of the *Code of France*, observes : " It is then the society alone, and not one of its members (without a mandate), which can dispose, by sale or pledge, of what belongs to it.    Even more, the preservation of the social capital is a point so important, that the majority cannot force the minority of the partners to sell the property not vendible (venales) which composes it."

The word venales, which I have translated vendible, means either things held or procured to be sold ; or things necessary to be quickly sold from their perishable character.    (*Troplong, article* 746, *Tome* 13, *p.* 229.)

The learned author again says, in commenting upon article 1859, (*Tome* 13, *p.* 203, *n.* 714), " this tacit authority (given by each to each other partner,) comprehends everything which is common in a procuration general ; the power to purchase ; to pay ; to receive; to hire or let; and to sell vendible articles."    So, in the remarks on article 1860, he quotes a civil law writer as follows : " *Aeque alienare potest nisi fructus aut alias res quae facile corrumpi potest,*" and observes, (*N.* 747) " and in this, civil partnerships agree perfectly with the commercial partnerships *en nom collectif*, in which every partner has the tacit authority to manage.    Every day we see one partner selling the merchandise, the traffic of which sustains the business. But in commercial partnerships this form of the right of administration is more apparent and more frequent, because they comprise a far greater number of things vendible, and that the incessant traffic of the merchandise is then a condition of existence.    But neither in the partnerships of commerce *en nom collectif*, nor in civil partnerships, can one partner dispose of things not vendible."

Once more he observes, that the 1860th article extends to a prohibition of a sale, by one partner alone, of moveables as well as of immovables, and a violation of it will subject the partner to an action *pro socio ;* but this concerns the partners

between themselves. In relation to third persons, to whom sale or pledges have been made, the articles 1862, 1863 and 1864, prescribe the rules.

In considering those articles (*Tome* 12, *p.* 239), he recognizes the great power of one to bind the whole in general partnerships, and states, " these principles are affected by modifications. One is, that the act must not plainly transcend the objects of the union. Suppose one associate sells, in the partnership name, all the immoveables, without which the firm cannot be carried on—is it not clear that the buyer cannot pretend to have the partnership considered the seller, when he has co-operated in an act destructive of the partnership?" (*Tome* 13, *p.* 294.)

It may be added that the law of France has provided in the fullest manner for the method of winding up a dissolved partnership. It is customary to name a liquidator in the articles. If that has been omitted, he can only be appointed by the unanimous choice of the partners; although a custom exists in many places of giving a majority this power. (*Troplong, Tome* 13, *p,* 484.) If an arrangement cannot be made, the courts are applied to. (*Ibid.*)

The 1859th and 1860th articles of the *Code Civile* of France is adopted *verbatim* into the Code of Louisiana. (*Article* 2841, *Civil Code Laws,* ed. 1825, *p.* 588.)

" 1. The partners are supposed to have given reciprocally to each other the power of administering one for the other. What one does is valid even for the share of his partners, without their approbation, saving the right which they or every one of them has to oppose before it be concluded.

" 2. Every partner may make use of the things belonging to the partnership, provided he employs the same to the uses for which they are intended (*a la detination fixie par l'usage*), and that he does not use them so as to prevent his associates using them according to their rights nor against the interests of the partnership.

" 3. (The third article relates to a contribution to expense.)

" 4. One partner can neither dispose of nor make any change

in the real property of the partnership, although to its benefit, without the consent of the other partners.

" 5. In other than commercial partnerships, a partner cannot, as partner only, and if he has not the administration, alienate or engage the things which belong to the partnership.

" Article 1860 of the French Code is, " The associate who is not the administrator, cannot alien or pledge the things, even moveables (*mobilieres*), which belong to the partnership."

The law of Scotland follows in the footsteps of Roman jurisprudence. (*Bell's Commentaries, Vol.* 2, *pp.* 615, 616.) That of Holland is equally guided by it.

I am justified, I think, in adopting the language of *Troplong :* " The maxims of the Roman lawyers, initiated by *Domat, Pothier* and others, and expanded by commercial custom, have laid the true foundations of the law of partnership. This was the first of long experience, and of the wise observation of important facts."

It results from this review that, in general, there was no power, as between partners themselves, in one of them to dispose of the common stock absolutely, without the consent of the others; that the unrestricted authority to bind the association was limited to partnership purposes, during the duration of the firm, for the object of carrying it on; that an act exceeding this limited power, by one partner, might give rights to an innocent purchaser; but if he took the whole property, implying that the partner was destroying the means of carrying on the business, he was not innocent; and lastly, that for the purpose of winding up a partnership the assent of all to a liquidation was necessary, or the tribunals of justice must be resorted to.

In considering the question as affected by the decisions now binding upon this court, we find some positions so settled as not to be open to discussion here.

*Deming* agt. *Colt* (3 *Sandf. S. C. R.* 284,) decides, that one partner could not, without the consent of the other, and without consulting him, although present and actively engaged in the business, make a general assignment to a trustee for the

benefit of the creditors without preferences. The principle of the court in that case was, that each partner has a great and powerful interest to see that a proper person is selected to wind up the affairs of the concern; as the judicious administration of the estate will beneficially affect the extent of the liability of each for the debts remaining undischarged, as well as the prospect of an ultimate surplus.

It was treated as settled law, that an assignment under such circumstances, giving preferences, was void. *Havens* agt. *Hussey* (5 *Paige R*. 30,) is referred to, and fully sustains the decision.

In *Hayes* agt. *Heyer*, (3 *Sandf. S. C. R*. 293), heard before the three other judges of the court, it was announced that the decision in *Deming* agt. *Colt* might be considered as expressing the unanimous opinion of all the justices of this court, that " a partner can in no case make a general assignment to a trustee for the benefit of creditors, against the consent or without the concurrence of his co-partner, the latter being present, and capable of acting in the matter."

*Fisher* agt. *Murray*, (1 *E. D. Smith's Rep*. 341), in the court of common pleas, is to the same point. The learned judge who delivered the opinion, used the words " under circumstances rendering it impossible to consult the other partners," instead of " the latter being present and capable of acting."

An assignment under such circumstances, giving preferences, would be even more clearly invalid; and so it was considered in *Kemp* agt. *Carnley*, 3 *Duer Rep*. 1. *Dana* agt. *Lull* (17 *Vermont Rep*. 390,) gives the express sanction, to this point, of two of the judges.

In *Ormsbee* agt. *Davis*, (5 *Rhode Island Rep*. 442, 1859), a general assignment, giving preferences, and mainly to the firm of which the assignee was a member, was held void when made by one partner, the other not being shown to have been away or incapable of being consulted. An attaching creditor impeached it.

In *Kemp* agt. *Carnley* (3 *Duer Rep*. 1,) the decision was, that when a partner had absconded, and relinquished all control

and management of the concern, an assignment by the other to a trustee, not giving preferences, was valid.

The case of *Mabbett* agt. *White* (2 *Kern. Rep.* 442,) involves the point: that one partner, when the firm is insolvent, may make a direct transfer of all the partnership property, to a single creditor, to pay the debts, without the knowledge or consent of the other partner, though he was present, or could have been consulted, there being no fraudulent intent to defeat creditors.

The court declare that it was not necessary in the case to decide whether the partner could make an assignment to a trustee for that purpose.

Judges DENIO and JOHNSON dissented, and the former examined the cases with care. · I am authorized by one of the learned judges who concurred in the judgment (Judge DEAN,) to say, that he should have come to a different result had the transfer been to a trustee, giving the creditor a preference.

This decision leaves the question, which arises in the present case, open for our determination. It is to be remembered that the absent partners were away upon the business of the firm, and, as soon as apprised of the assignment, repudiated it.

Upon the principal question, then, my own conclusion is that an assignment, without the concurrence of acting partners, of all the property of a firm, giving preferences, is void. It is void because the partners have never vested each other, by force of the partnership union, with such a power. It is invalid, because it controverts the great object of a partnership, the true theory and the most sacred bond of the connection, the furtherance of partnership objects, so long as they can be attained, and the equal power of each to watch over and direct the application of the funds when insolvency overtakes the firm. It is not warranted, in the present case, by the absence of the other partners. That created no emergency which can justify it. The law will sanction an assignment distributing the property among all the creditors, because the law assumes that all the associates will unite in what equity dictates. The law opens another mode to the partner, by throwing the ad-

ministration of the funds into a court of equity. It has been suggested, and the argument receives no slight strength from *Mabbett* agt. *White*, that as the present assignee was a preferred creditor, (to an amount, indeed, of $1291.50 out of about $1620), the transfer must be valid as to his demand, as if the property had been made directly and delivered to him.

It may be answered, if this may prevail, the rule requiring the concurrence of the partners is effectually defeated. Let all the preferred creditors be named trustees, and the object of the assigning partner will, in the great majority of cases, be attained.

Again, upon a direct transfer in payment of a debt, the partners are discharged; the debt is extinguished. This was the case in *Mabbett* agt. *White*, where a note of the purchaser was given for the balance. Here the partners will be left responble for any deficiency.

Again, here is a trust created to sell the property, to collect the debts, to pay the expenses of the assignment, and, yet more, to defray the costs and expenses of prosecuting or defending suits connected with the assignment.

In the case of *Ormsbee* agt. *Davis*, before cited, a subsequent transfer of part of the partnership property to the creditor, in satisfaction, or even security for the debt, was supported. The line of distinction I have pursued in this argument, is strikingly shown in that authority.

I conclude that on no ground can the transfer in question be sustained; and that the judgment appealed from must be affirmed.